**People of the State of Illinois, Plaintiff-Appellee, v. Elsworth Brown, Defendant-Appellant.**

**Gen. No. 50,845.**

First District, Third Division.

August 10, 1967.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Frederick F. Cohn and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Morton Friedman, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE DEMPSEY delivered the opinion of the court.

Elsworth Brown was convicted by a jury of the crimes of rape and robbery. He was sentenced to the penitentiary for a term of from 50 to 100 years for the rape and to a term from 5 to 10 years for the robbery, the sentences to run concurrently.

The defendant contends that his convictions should be reversed because the evidence did not prove beyond a reasonable doubt that a rape had in fact occurred and that the method of identification employed by the police left a reasonable doubt that he was the assailant. He also contends that his convictions should be reversed and the case remanded for a new trial because: the prosecution appealed to the racial prejudice of the jury both in its opening statement and in the introduction of evidence; the prosecution was allowed to introduce opinion evidence which invaded the province of the jury; remarks of the trial judge while defense counsel was attempting to impeach the prosecutrix, denied him a fair trial, and the closing argument for the prosecution was prejudicial. In the alternative he contends that the sentences imposed upon him are excessive.

About 6:45 p. m. on January 6, 1965, the prosecutrix, who was 44 years of age, arrived at Mount Sinai Hospital, Chicago, to visit her mother. She parked her car across the street from the hospital in Douglas Park and left the auto unlocked. After visiting with her mother she returned to her car, entered by the driver's door and put the key in the ignition.

She testified that at this moment a man, who had concealed himself in the back seat of the car, reached up, grabbed her around the neck with one hand and placed a four-inch dagger against her throat with his other hand. She thought, at first, it might be a robbery so she threw her purse containing $28 into the back seat and said for him to take the money. She pleaded with the man to leave her alone telling him that she was a grandmother and was in her menstrual period, and that her mother was to have her leg amputated. A squad car passed through the park and the man pushed her head down, warning her that if she screamed she would be killed.

After the police car had passed on the man slid his hand down her coat and touched her breasts. She attempted to free herself but he hit her on the side of the head. Blood flowed from the wound. She cried and he told her he would kill her if she did not do as he said. He asked if she ever had sexual relations with a Negro. With his knife at her throat he ordered her to drive out of the park and into an alley. She passed the alley, stopped the car and opened the left-hand door in an attempt to flee, but the man jumped into the front seat, beat her severely and again threatened to kill her.

She was compelled to drive the car into another alley and to turn its lights off. He took the keys from the ignition, told her to make love to him like she did to her husband, ripped her blouse, removed her shoes, slacks and her sanitary brief pants. She said she was hemorrhaging and sick and begged him to leave her alone. She kept

her legs together but he forced them apart and raped her. He took back the tissue he had previously given her to wipe the blood from her face, used it to remove his fingerprints from various parts of the car, gave her the ignition keys and left.

After he had departed the prosecutrix urinated over the front seat; it was an attempt, she said, "to force out possibly what was left in me." She drove from the alley and was hurrying to get out of the colored neighborhood when she saw a cab with a white driver. As she hailed the driver, a police car pulled up alongside of them. She called out, "Help me. Help me. I've been raped."

The policemen took her back to Mount Sinai Hospital where the wound in her head was stitched and general medical care administered to her. While at the hospital, police officers brought in a suspect for her to observe but she said this was not the man who attacked her.

The following day the prosecutrix viewed approximately 400 pictures and two days later she was shown about 500 more pictures in albums and projected on slides, but she did not see the picture of her assailant. She viewed lineups with the same result. Six days later, on January 15th, she was shown two pictures of a man who was in police custody. She asked to see the man in person. Upon viewing a lineup composed of six Negro males she positively identified the defendant.

The defendant's principal witnesses were two doctors in residency at Mount Sinai Hospital. One testified that he had examined the prosecutrix the night she was brought into the emergency room; that she had a laceration near her eyebrow but that he saw no other laceration or bruise either on her face or in or outside her vagina. He said he took a smear from her vagina and that she was not menstruating. The second doctor testified that on the same night he examined the smear and was unable to find spermatozoa. On cross-examination he testified that the slide was "fixed and stained" and

169

reexamined the next day. It was stipulated that the second examination showed the existence of a few degenerated spermatozoa.

Two of the witnesses called in rebuttal by the prosecution were a gynecologist and the nurse on duty in the emergency room when the prosecutrix was brought in. The gynecologist, whose entire testimony was objected to by the defendant, was asked a hypothetical question as to whether an injury would be found to the vaginal area of a 44-year-old woman who had been married 24 years and had delivered three children, if she engaged in sexual intercourse and was examined about a half hour later. The witness replied that the woman should not, under ordinary circumstances, have any injuries and that it would make no difference if she was in her menstrual period. On cross-examination he added that there can be an injury during sexual relations whether they are forcible or not, but that there are not usually injuries to a vagina that has delivered three children, whether the relations are forcible or are not. The nurse testified that she noticed a small amount of blood around the prosecutrix' vaginal area when she undressed and again when the area was cleaned. She said the prosecutrix asked for a sanitary pad and she gave her one.

In support of his contention that there is a reasonable doubt whether a rape occurred, the defendant argues that it is improbable that the incidents related by the prosecutrix could have taken place in the early evening in a crowded, colored neighborhood. He also argues that there is little or no substantiation of her story that her clothes were torn, that she was beaten or cut or that she was in her menstrual period. He amplifies these arguments by pointing out that at the trial the State did not produce the clothing, the front seat of the car (to prove the presence of sperm, blood or urine), or the taxi driver who was supposed to have been the first white person she saw after the rape.

██ When a conviction in a rape case is dependent upon the testimony of the prosecutrix and the charge is denied, the testimony of the prosecutrix must be corroborated by evidence of other facts and circumstances (People v. Reaves, 24 Ill2d 380, 183 NE2d 169 (1962)) unless her testimony is clear and convincing, in which case corroborative evidence is not required. People v. Mack, 25 Ill2d 416, 185 NE2d 154 (1962); People v. White, 26 Ill2d 199, 186 NE2d 351 (1962).

██ In the instant case the testimony of the prosecutrix is clear and convincing and corroborated as well. Her detailed account of the events was unshaken. There is no reason to doubt their accuracy. Her testimony was corroborated by the immediate complaint to the police, the bloody condition of her face, her wound which required two stitches to close, the sperm on the stained glass slide, the testimony of an officer that her clothing was torn and the testimony of the nurse that she was in her menstrual period. The cabdriver was not a material witness. The State was under no duty to call him as a witness or to explain his absence.

 The defendant next argues that the prosecutrix' identification was vague, uncertain and contradictory. This argument is predicated on the fact that the police, prior to the lineup, showed her two pictures of him and told her they were of a man who had been arrested. It is argued that this amounted to suggestive identification. There is no requirement that a lineup be used in all identification proceedings. The failure to use the lineup procedure does not affect the admissibility of the evidence, but only the weight to be attached to it by the trier of fact. People v. Gardner, 35 Ill2d 564, 221 NE 2d 232 (1966); People v. Boney, 28 Ill2d 505, 192 NE2d 920 (1963). The same rule is applicable when a claim is made that an identification was brought about by the police telling the victim that a person suspected of the crime is in custody. People v. Crenshaw, 15 Ill2d 458, 155

171

NE2d 599 (1959); People v. McIntosh, 82 Ill App2d 90, 227 NE2d 76. The sufficiency of identification is a question for the jury and a court of review will not reverse on this ground unless the testimony is so unsatisfactory as to create a reasonable doubt as to the guilt of the accused. People v. Brengettsy, 25 Ill2d 228, 184 NE2d 849 (1962).

■ ■ In the present case the prosecutrix had both time and opportunity to study the face of her attacker and she testified that she did so. She was most careful in making the identification. A suspect was brought into the hospital for her to view and she unhestitatingly said he was not the assailant. During the next few days she viewed approximately 900 pictures and attended some lineups, a process consuming no small amount of time, and she was still unable to identify her attacker. When she was shown the defendant's pictures she did not jump to the conclusion that he was the man but, instead, exhibited great caution. The prosecutrix lived and worked in a Chicago suburb. To save her another trip to police headquarters in Chicago, a detective working on the case took the two pictures to her. These were not police department pictures. One was obtained from the defendant's grandfather, the other was on the defendant's person when he was arrested. The former was about three years old, the latter was taken at an untestified time. The record does not disclose whether the first one was a snapshot or a photograph, a picture of the defendant alone or in a group. The second one was on an institutional identification card. In any event, the pictures were such that the prosecutrix wanted to see him in person. When she saw that person she was positive he was the man. Where the only question is one of identification, the testimony of one credible witness, if positive, is sufficient to convict. People v. McCall, 29 Ill2d 292, 194 NE2d 222 (1963). The extreme care exercised by the prosecutrix does not

■■■■■■■■■■■■

sustain the argument that her identification of the defendant was influenced by the police, and it leaves no abiding doubt that the identification was correct.

■■ The defendant contends that the use of the words "colored neighborhood" by the prosecutrix in describing the area where the crime took place, and her testimony that he asked her if she had ever been "f ----- by a nigger" were an appeal to the racial prejudice of the jury and denied him a fair trial. The assistant State's attorney used the exact words in his opening statement and there was no objection by the defendant's counsel. There were objections to the prosecutrix' testimony, but the objections were overruled. If the testimony was proper, the remarks of the prosecutor in his opening statement were likewise proper. People v. Pieper, 410 Ill 15, 101 NE2d 109 (1951).

■■■ There are two reasons why this contention must fail. First, there is no indication in the record that the jury was composed entirely of persons who were not members of the Negro race. For the contention to even merit consideration it would have to be shown that there was a non-Negro jury. Secondly, while evidence offered solely for the purpose of appealing to a jury's prejudice against an accused must be excluded (People v. Bernette, 30 Ill2d 359, 197 NE2d 436 (1964)) evidence which is relevant and otherwise admissible need not be excluded because it may also have a tendency to prejudice a defendant. People v. Jackson, 22 Ill2d 382, 176 NE2d 803 (1961); People v. Evans, 25 Ill2d 194, 184 NE2d 836 (1962).

■■ ■■ The defendant's question relating to sexual intercourse with Negroes showed his intent. The words used were those of the rapist and the prosecutrix' quotation was correctly received in evidence. In People v. Mulvaney, 286 Ill 114, 121 NE 229 (1918) the court said: "Whenever it becomes important to show . . . the oc-

currence of any fact or event, it is competent and proper also to show any accompanying act, declaration or explanation which relates to or is explanatory of such fact or event." The reference of the prosecutrix to a "colored neighborhood" was not prejudicial. Her answer was in response to a question concerning the locality where the rape occurred. It was a natural, if unexpected, response and the objection to it was properly overruled.

██ ██ Of the defendant's last three contentions only two merit discussion. The other, concerning a remark made by the trial court in ruling on an objection, is devoid of merit. It is argued that it was error to permit the gynecologist to answer the State's hypothetical question. One of the purposes of the defense evidence was to imply that the prosecutrix had not been raped because there were no injuries to her perineum or vagina, and because she had not been infected with gonorrhea, a contagious disease with which the defendant was acutely afflicted. It was proper to permit the State to rebut such implications by expert testimony, and the expert's answer to the hypothetical question did not invade the jury's prerogative of determining the ultimate issue of whether or not there had been forcible intercourse. As to the last point, it is argued that prejudicial comments were made by the prosecutor in his final argument when he said: "I don't think that you can possibly say that this never occurred. I don't think there is one bit of evidence in this record that this defendant didn't do it." An objection was interposed and was sustained. The defendant who did not testify at the trial, claims that the comments were an allusion to this fact.

██ The failure of an accused to testify at a trial creates no presumption against him and comment on or reference to such failure is not permitted. Ill Rev Stats 1965, c 38, § 155–1. The comment of the prosecutor, however, does not fall within such prohibited conduct. The

first of the quoted sentences was directed to the truth of the prosecutrix' testimony and the second was addressed to the identification of the accused. Both were proper. People v. Jones, 33 Ill2d 357, 211 NE2d 261 (1965); People v. Norman, 28 Ill2d 77, 190 NE2d 819 (1963).

■■ The defendant protests that the sentences imposed upon him are excessive and he urges that we reduce them. This court has the authority to lower sentences in appropriate cases (Ill Rev Stats 1965, c 38, § 121–9(b)(4)) but the power granted this court should be used with considerable care and only where there are substantial reasons for doing so. People v. Taylor, 33 Ill2d 417, 211 NE2d 673 (1965); People v. Valentine, 60 Ill App2d 339, 208 NE2d 595 (1965). The 22-year-old defendant had been incarcerated in three states: Wyoming, Illinois and Virginia. The first two were sentences of 30 days each for the offenses of larceny and obtaining money by false pretenses, but the third was an eight-year sentence for robbery. The rape in the case at bar was committed 16 days after his release from the Virginia Penitentiary. The defendant's sentence for rape is severe, but in view of his record and the brutality used upon the prosecutrix there is no sound reason for making it lighter. ˎ

Judgment affirmed.

SULLIVAN, P. J. and SCHWARTZ, J., concur.